UNITED STATES DISTRICT COURT
WESTERN DISTRICT
ALEXANDRIA DIVISION

| | |
|---|---|
| CHRIS AUGUSTINE, ET AL | CIVIL ACTION NO. 1:06CV1662 |
| Versus | JUDGE DRELL |
| AVOYELLES PARISH POLICE JURY | MAGISTRATE JUDGE KIRK |

_____

PLAINTIFFS' POST-TRIAL MEMORANDUM ON THE
ISSUE OF PREVAILING PARTY STATUS

*Pertinent Hearing Testimony*

At the April 16, 2009, hearing on whether Plaintiffs should be declared the prevailing party in this litigation, the former President of the Avoyelles Parish Police Jury and the two minority jurors at the time plaintiffs lawsuit was filed all testified that the Avoyelles Parish Police Jury had done nothing toward redistricting itself to increase the number of minority districts, nor had the Police Jury formally responded to a request from one of the plaintiffs to redistrict itself.  The fact that Defendant says it was "discussing" the issue and said that no one was opposed to increasing the number of minority districts is of no moment because it did nothing about it until after it had been sued.  Most of the substantive allegations stated in Defendant's brief are not supported by the record of the testimony adduced at the hearing.

It took the parties thirty-one months after Plaintiffs filed their lawsuit to agree on a plan for joint submission and ultimate adoption by the Court.  This protracted litigation resulted from the inaction of a police jury whose sole defense to Plaintiffs' lawsuit was, "We were going to do it anyway."  The record of these proceedings is replete with much contested and highly adversarial proceedings which should not have been the case if the Avoyelles Parish Police Jury was going to redistrict itself anyway.  All such evidence is to the contrary.

1

The filings, motions, rulings, testimony and exhibits reveal a much clearer picture of what actually transpired for over two and a half years of litigation. Defendant now presents a new, unsupported claim in its third brief on this issue that the only pre-lawsuit action taken on behalf of the police jury was to request an Attorney General's Opinion which he states was worked on for approximately two weeks by Heather Urena before submitting it to the Secretary-Treasurer for his approval. It is also Defendant's counsel's current allegation that he requested the Attorney General opinion. Plaintiffs aver these are gross misrepresentations of the facts and testimony.

Heather Urena testified, without providing a time period, that she drafted the letter, and because of her reputable writing skills, corrections or changes were not warranted. To the recollection of Plaintiffs, she did not testify how her alleged involvement with the letter began. She did, however, unquestionably testify to this Court that she had told jurors that a third minority district could not be created. She later told this Court under direct examination by this Honorable Court that it would be difficult to create three (3) majority-minority districts. As this Court aptly recognized, another district was created. Plaintiffs assert that given her stance about redistricting, it is wholly unlikely that she participated, in any manner, with the composition of an opinion request to the Attorney General. Former Police Jury President, Henry Hines, unequivocally testified that he requested the opinion after being asked about it by McKinley Keller - not the police jury, or Heather Urena or the attorney for the body politic.

Defendant states that none of the police jurors opposed creating a third majority-minority district. Plaintiffs emphasize that prior to the institution of this lawsuit, no formal actions had been taken by the body politic to redistrict the police jury. Additionally, even after the lawsuit was filed, it took almost three (3) years for this "unopposing" body to enter into a joint

2

stipulation with Plaintiffs. Defendant was dilatory throughout this process, which is indicated by the history of this case by the number of motions to compel filed by Plaintiffs and requests for status conferences made by Plaintiffs.

Defendant would have this Court believe that Heather Urena, who had received plans from Plaintiffs' expert, Glenn Koepp, devised the jointly submitted plan on her own – without any input from Koepp. Urena made it cleat that she would be unwilling to accept any ideas presented by Koepp because she had philosophical differences with him. Koepp not only believed a third majority-minority district could be created, he devised plans to create it; Urena did not think it could be done.

## LAW AND DISCUSSION

Everything about this litigation points to the Plaintiffs being declared the prevailing party. Plaintiffs will not here reiterate all the facts, circumstances and arguments of their original brief on this question, but incorporates all the same by reference.

At the conclusion of the April 16, 2009 hearing, the court cited *Buckhannon Brd and Care Home, inc. v. west Virginia Dept. of Health and Human resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) for consideration and analysis within the context of the facts and circumstances of the case *sub judice*. Plaintiffs assert that applying *Buckhannon* and subsequent Fifth Circuit cases will warrant granting them prevailing party status.

In *Buckhannon*, Buckhannon Board and Care Home, Inc., which operated care homes that provided assisted living to their residents, failed an inspection by the West Virginia Office of the State Fire Marshal because some of the residents were incapable of "self-preservation" as defined under state law, which required that all residents of residential board and care homes be

3

capable of "self-preservation," or capable of moving themselves "from situations involving imminent danger, such as fire"). After receiving cease and desist orders requiring the closure of its residential care facilities within 30 days, Buckhannon Board and Care Home, Inc., on behalf of itself and other similarly situated homes and residents, brought suit in the United States District Court for the Northern District of West Virginia against the State of West Virginia, two of its agencies, and 18 individuals, seeking declaratory and injunctive relief that the "self-preservation" requirement violated the Fair Housing Amendments Act of 1988 (FHAA), 102 Stat. 1619, 42 U.S.C. § 3601 *et seq.,* and the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U.S.C. § 12101 *et seq*. While the lawsuit was pending, the West Virginia Legislature enacted two bills eliminating the "self-preservation" requirement and the respondents moved to dismiss the case as moot. The District Court granted the motion, finding that the 1998 legislation had eliminated the allegedly offensive provisions and that there was no indication that the West Virginia Legislature would repeal the amendments. Petitioners then sought attorney fees as the prevailing party.

In the case at hand, unlike *Buckhananon*, the change or the ceasing of an illegal act resulted from a joint stipulation from the actual parties involved in this case. A third majority-minority district, which was sought by Plaintiffs in their suit, was jointly created by and submitted by the parties, not by an outside third party. The relief sought by the Plaintiffs in their lawsuit was obtained when the joint stipulation was presented to this Court for adoption, to the United States Department of Justice for preclearance and to the Louisiana Legislature for certification.

Clearly, the facts of *Buckhannon* are tremendously different from those at hand.

Only when a party has prevailed on the merits of at least some of his claims . . . has there been a determination of the 'substantial rights of the parties,' which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney" (H. R. Rep. No. 94-1558, at 8)).  Plaintiffs declare they have prevailed on the merits of their case, and this is evidenced by the creation of the third majority-minority district.   Therefore, they are not required to bear their own attorney fees.

In *Tunica-Biloxi Tribe of Indians v. Bridges,* 2006 U.S. Dist. LEXIS 48381 (M.D. La. June 28, 2006), which was decided five years after *Buckhannon,* the court found the plaintiffs were "prevailing parties" under § 1988, and that the district judge's order of dismissal expressly incorporated the parties' agreed upon stipulation to a sufficient degree to affix a judicial imprimatur upon it.  The court opined the terms of the stipulation showed the plaintiffs clearly obtained relief on the merits of their claims.  The defendants not only fully refunded plaintiffs' money for taxes wrongfully collected, but also agreed to prospective relief. The relief plaintiffs sought in this litigation is the relief plaintiffs obtained in the stipulation.

The *Tunica-Biloxi* court also found the record showed that the stipulation and order also changed the legal relationship among the parties.  As examples, the court recognized that prior to the stipulation and order, policy lacked any sense of permanency as to plaintiffs and other tribal members, and because an administrative policy or procedure is not the same as a statute, defendant could quickly sweep it away with the stroke of a pen. The court opined the stipulation was a binding contract that constituted the law between the parties, and a court order was enforceable by said court.

In the case at bar, Plaintiffs avow the joint stipulation and Order changed the legal relationship of the parties. The Order, which was signed by this Court on January 6, 2009, recognized the creation of and its approval of and adoption of the joint plan, in which the title suspiciously excluded Plaintiffs involvement. As this Court should recall, Plaintiffs objected to the implication that this plan was voluntarily created by Defendant.

The record in this case supports a finding that this Court's Order sufficiently gives the requisite judicial imprimatur needed to entitle Plaintiffs to attorney fees. The Order clearly states the plan was created and approved and that it was to be submitted to the Civil Rights Division of the United States Department of Justice for preclearance, and upon the receipt of the necessary approvals, evidence of the same was required to be furnished to the Court, along with a suggested implementation plan.

Defendant attempts to deny that a consent decree exists in this case; Plaintiffs disagree as there was an entrance of a joint stipulation regarding the creation of the third majority-minority district. Only for the sake of argument if this Court ponders accepting Defendant's flawed argument, Plaintiffs aver district courts can interpret the Supreme Court's references to final judgments on the merits and court-ordered consent decrees in *Buckhannon* as examples rather than as requirements; the Court stops short of stating that prevailing party status is unobtainable based on other forms of court-ordered relief. A reading of *Buckhannon* does not reveal an exclusive list of court-ordered relief. *See Buckhannon*, 532 U.S. at 605 (referencing the judgment on the merits and consent decree as mere "examples"); *Dupuy v. Samuels*, 423 F.3d 714, 719 (7th Cir. 2005); *Select Milk Producers, Inc. v. Johanns*, 365 U.S. App. D.C. 183, 400 F.3d 939, 945 (D.C. Cir. 2005); *John T. v. Del. County Intermediate Unit*, 318 F.3d 545, 558 (3d Cir.

2003); *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 753-54 (6th Cir. 2002); *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002).

Taken in full, *Buckhannon* requires that the desired result stems from a court order, not a judicial recognition on the merits. Thus, in this case, the judicial imprimatur required by *Buckhannon* is satisfied, not by recognition of the merits, but by obtaining relief through an enforceable judgment from this Court.

## CONCLUSION

The fact that once this plan was jointly submitted to and adopted by the Court, pre-cleared by the United States Department of Justice and certified by the Louisiana Legislature, at the behest of counsel for Plaintiffs, this reapportionment plan became enforceable according to the tenor of *Buckhannon*, which must give rise to a court-ordered declaration of Plaintiffs as the prevailing party. This clearly has altered the legal relationship of the parties. Defendant cites in its brief that most things happened or that they acted a certain way because a lawsuit was filed. This is precisely the point: Without Plaintiffs' lawsuit we would all be left with the unfounded notion by the Avoyelles Parish Police Jury that "we were going to do it anyway."

Plaintiffs reiterate the factual differences which make *Buckhannon* inapplicable to the case at hand. The change or the ceasing of an illegal act resulted from a joint stipulation from the actual parties involved in this case. A third majority-minority district, which was sought by Plaintiffs in their suit, was jointly created by and submitted by the parties, not by an outside third party. The relief sought by the Plaintiffs in their lawsuit was obtained when the joint stipulation

was presented to this Court for adoption, to the United States Department of Justice for preclearance and to the Louisiana Legislature for certification.

Furthermore, *Buckhannon* did not involve issues of voting rights discrimination, but rather issues related to violations of the Fair Housing Amendments Acts of 1988; 42 U.S.C. § 3601, *et seq*. and the Americans with Disabilities Act of 1990, 42. U.S.C. § 12101, *et seq.*

`       After this protracted litigation a redistricting plan was jointly confected and jointly approved for submission to this Court for its consideration.  This Court adopted the jointly submitted reapportionment plan, although it was conveniently titled "Avoyelles Parish Voluntary Reapportionment Plan," but the plan would not have been jointly submitted without the input, consent and approval of plaintiffs, their counsel and their demographer.  The plan went from two minority districts to three minority districts, which certainly alters the legal relationship of the parties.

Finally, Defendant has never addressed the Court's central question for the April 16, 2009 hearing:  whether there is a defense to prevailing party status to the effect of "we were going to do it anyway."  Plaintiffs submit they did not because they could not.  There exists no such defense to that "argument."

Plaintiffs show they have met their burden of proving they should be declared the prevailing party in this litigation.  Their actions resulted in three minority districts out of nine on the Avoyelles Parish Police Jury.

Furthermore, to deny disadvantaged Plaintiffs with limited resources and means prevailing party status would have a chilling effect upon the institution of civil rights litigation in

contravention of the Congressional and judicial interest in protecting suspect classification citizens of the United States.

Respectfully submitted:

/s/ Charles D. Jones
Charles D. Jones
Bar Roll No.   07476
141 Desiard Street, Suite 315
Monroe, Louisiana 71201
Phone:  (318)325-2644
Fax:  (318) 325-2647
Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

**I, CHARLES D. JONES, HEREBY CERTIFY** the preceding Post-Trial Memorandum has been served on counsel for Defendant by using the CM/ECF system, which will transmit a notice of electronic filing to the following:

Mr. Charles A. Riddle III
Avoyelles Parish District Attorney
P. O. Box 1200
Marksville, LA  71351

**THUS DONE ON THIS 25th DAY OF APRIL 2009.**

   /s/ Charles D. Jones
   CHARLES D. JONES